Good morning, ladies and gentlemen. Our first case for today will be Miranda v. County of Lake. So, Ms. Hoft? Thank you, and good morning, Your Honors, Judges Hamilton, Wood, and Easterbrook. My name is Janine Hoft, and I, along with my colleagues Jan Susler, Shubra Ori, and John Stainthorpe, we represent the plaintiff appellant in this case, the estate of Levita Gomes by its administrator, Alfredo Miranda. Levita Gomes was a 52-year-old national of India when she was detained at the Lake County Jail on a minor charge. Throughout her 15-day incarceration, she did not eat or drink, while the medical and corrections defendants watched her obvious condition deteriorate. When they finally sent her to the hospital, she was in multiple organ failure, and it was too late to save her life. She died within a matter of days of dehydration and starvation. This appeal raises the following four issues. Number one, that the jury should have been allowed to determine damages for wrongful death. Number two, that the standard of care for violation of a constitutional right of a pretrial detainee is whether a defendant's conduct was objectively unreasonable. And three, that the jury should have been allowed to consider plaintiff's constitutional claim for failure to protect her while she was in custody. And finally, four, that a jury should determine the liability of the corrections defendants. I want to first focus on the dominant issue in this case, which is causation, and the district court's refusal to allow the jury to consider the damages for wrongful death. Proximate cause was a decision for the jury. The law in this circuit has repeatedly held that causation is a question for the jury. The defendants do not and cannot deny this general principle. The district court below erred in limiting the damages in the case to the 15-day incarceration period. Now, wasn't that largely because the district court thought that the coroner's report needed further elaboration? That was one of the issues that the district court responded to. The coroner's report, however, there was additional evidence. It was the coroner's report. It was the plaintiff's experts. It was the testimony of the defendants, Dr. Elizaghi and Dr. Singh themselves, as well as the testimony of Dr. Kim, who, upon returning from vacation, took one look at Ms. Gomes and ordered her immediate transport to the hospital. The coroner's report, though, unequivocally concluded that Ms. Gomes' cause of death was due to complications of dehydration and starvation. Now, the district court wasn't sure what complications he was talking about, and I guess there are two ways of approaching that. One would be to say, but bottom line, it was starvation and dehydration. It wasn't that she got an infection. It wasn't that other things happened. I take it there is other testimony in the record that she was going into organ failure or no? There was a testimony in the record from the Vista East hospital records that indicated when she arrived at the hospital she was in liver and kidney failure. So that is there. Okay. And in addition to that, the ambulance report indicates that when they arrived at the jail, after being called by Dr. Kim, that they took a blood draw of Ms. Gomes, they gave her an IV hydration, and they activated lights and sirens from the scene at the jail to the hospital. And when she arrived at the hospital, they determined it was a certified medical emergency. Now, again, back to the coroner's report, the legislature of Illinois has determined that a coroner's report is prima facie evidence of cause of death. And the reasoning behind this legislation is not only because of the indicia of objectivity and reliability in such a report by a public official, but also to protect those public officials, coroners, from having to come into court and provide testimony about cause of death. Could I ask you, I didn't see any statement anywhere to the effect of she had been deprived of both food and water for so long by the time she's transported to the hospital that she had passed the point of no return, something like that. So I'm wondering whether your theory is that their failure to treat, or whether there is any theory that their failure to treat either was the immediate cause of death or at the very least deprived her of a significant opportunity to survive this starvation. Yes, I think particularly the latter. And that was because what they did at the jail was merely observe her. They couldn't monitor her consistently. They had her on suicide watch and they had corrections officials observing her every 15 minutes. We don't really know what they were, well they weren't told what they were to observe and what they were to report. And merely watch this obvious condition of not eating and drinking, that was clear to everybody, get worse and worse. So that at one point, farther down, rather than giving her any treatment at all, they put her on bed rest because she was unsteady on her feet. And they were, at that point they lost the opportunity. And our expert, Dr. Reba, said that Dr. Elizaghi, the internist at the jail, should have transferred her out at least by December 23rd. She'd been there since December 14th with this same behavior continuing and the failure to eat and drink causing her obvious condition to deteriorate more and more and more. So at what point, I mean Dr. Singh is in this picture too, and a time comes when he, well two things happen. One thing that happens is isn't he the one who eventually says that she's not capable of making her own medical decisions? That's correct. On December 27th, I believe, Dr. Singh unequivocally documents that she's incapable of making medical decisions. He's only seen her twice, but he saw her on December 24th too, and at that time he determined that she was psychotic. Didn't do anything, just then saw her again the next time he arrived at the jail. And the plaintiff's expert, Dr. Gilligan, specifically testified that Dr. Singh's conduct contributed to Ms. Gomes' death and that she was certainly in an acute psychiatric emergency at the time that Dr. Singh saw her. There was a lot of testimony that everybody relied on this phrase that Dr. Elizaghi said at one point or some unknown nurse said that she was medically stable. Well, Dr. Reba, the plaintiff's expert, categorically denied that when he looked at the vital records. But beyond that, Dr. Singh knew and our expert, Dr. Gilligan, testified that she was in an acute psychiatric emergency, so she was clearly not psychiatrically stable. And the issues of the medical defendant's own policy said that not eating and drinking could be fatal within a few days and that the preeminent thing that the medical personnel were to do was to determine what her psychiatric state was. Because if somebody is incompetent and not eating or drinking, not because they're trying to get one over on the jail, but because they're not in their right mind, then something needs to be done immediately. I take it the record's clear that the jail physicians had the authority to transfer her to the hospital? Absolutely, and that was borne out when Dr. King came back from vacation, immediately saw her and sent her out to the hospital and stayed with her until the ambulance came in order to make sure she did not go into cardiac arrest or respiratory failure. And that was done immediately. And Dr. Kim, above and beyond that, started asking around, how did she get into this condition? How was she allowed to get in this condition? So the testimony was also that anyone at any time could have called 911, could have requested that an ambulance transport her to the hospital. And this was also borne out. She shouldn't have even been in custody. And this was attested to by the corrections officials' conduct. When she finally was transported to the hospital, they went right to a judge and sought her release on an I-bond, without any cash money, to get her released from the jail. So she was no longer in custody by the time she was relocated to the hospital. Did that affect billing? Well, we believe it did. There was an agreement, I think, that the corrections, the county and the CCS defendants shared the cost of outside services. But be that as it may, it was an important admission that this woman, who had been originally taken into custody for failure to serve on a jury. For failure to do something that it was illegal for her to do. Exactly. And when the arresting officer, who testified at the trial below, said that he went to her home and told her about the warrant. Counsel, this sounds like disagreement with the judge's decision to commit her. And the medical defendants are not liable for that. I think we need to focus on the medical issues. I'm interested in the question, what difference your Fifth Amendment theory makes? It looks like everything that happened in this case adverse to the plaintiff relies on the district court's causation decision, rather than any decision about the standards of liability. So is there any issue before us about what is the difference between the Eighth Amendment and the Fifth Amendment and the Fourth Amendment here? And we believe the Fourteenth Amendment would apply to pretrial detainees. No, I understand that it's the Fourth, Fifth, and Eighth Amendment. It's applied to the states through the Fourteenth. The question is, does any of that matter? It looks to me like it's the causation decision that's driving everything and not any decision about required mental states. Now, if that's wrong, I'd like to know why it's wrong. No, we believe that the dominant issue in this case is causation. But this is also the perfect case to deal with the issue of deliberate efforts. No, look, if it doesn't matter, we don't resolve something. I'm trying to figure out what matters. Well, what would have been done differently if you'd had the objective reasonableness standard as opposed to the deliberate indifference standard borrowed from the Eighth Amendment? That's, I think, the question. I understand. Where would you have won? Where you lost? Right. And we believe that in this case, the deliberate indifference for the 15 days went to the jury on three defendants, the social worker, Bibiano, and the doctors who are at issue of this appeal. But there were damages against Bibiano which had been paid, and so your opponents say, well, you can only get one recovery anyway, so does that matter anymore? What would be different as we sit here? My point was that the evidence was that this was by how the jury could not reach a determination on the deliberate indifference standard. I understand, but they did deliver a verdict against Bibiano, presumably for the same period of time. I mean, the damages she suffered were up until the time she goes to the hospital were compensated, right? Correct. That's the 119 or so. Correct. And the single recovery rule would apply to a claim or a defendant who was limited to this 15-day incarceration. And that's why, as Judge Eastbrook says- Is the objective theory something that gets you all the way to the wrongful death issue? I mean, what more will you get if you prevail? If we prevail on the standard that's appropriate and entitled for pretrial detainees, a jury would determine objective reasonableness rather than deliberate indifference. And the fact that the jury below could not decide on this standard, this higher standard of deliberate indifference against the doctors, leads us to believe that if they were able to decide objectively- My question, and as I understand it, the Chief Judge's, is would you get more money? If you wouldn't get more money, then the number of defendants against whom you get the same verdict doesn't matter since the $119,000 has been paid. Assuming that that's all there is for that period, does the standard, the choice of legal standards, matter to your claim for a remand? Not if the single recovery rule- Counsel, let me see if I understand this correctly. If we agree with you that the cause of death issue should go to the jury, then you get a new trial on that claim. The judge on remand will need to decide how to instruct the jury on that claim. And that's where we have to decide, if we go that path, whether the instruction should be deliberate indifference or a variation on Kingsley or something else. Is that right? Absolutely. Okay. So obviously if we were to order the jury to be instructed on the Kingsley standard, there's some legal risk for you in the long term, but that's what you think ought to be done, right? That's correct. And we believe that the dominant issue in the case is causation. And I just want to say a few more issues unless there are other questions. Then I need to take you to a second question, which the briefs don't address in this case. The Supreme Court held way back 30 years ago in Daniels that the Fifth Amendment is not violated, the Due Process Clause is not violated by negligent conduct. Given that rule, how can the Fifth Amendment help you here? Kingsley was very clear that it was dealing with an intentional use of force. And then the question was, was that intentional use of force reasonable? There's no claim here of intentional use of force. So I'm worried about the Daniels rule and about its companion doctrine, Peratt, which is that when you claim under the Fifth Amendment that due process is violated by unauthorized wrongdoing, the question is whether state law supplies a remedy. And, of course, you believe that state law does supply a remedy because you had a state law claim joined with the federal claim. So the question I'm now asking is whether under Daniels and Peratt, your Fifth Amendment claim just doesn't collapse to your state law claim. Absolutely not, Your Honor. And the reason is because the Fourth Amendment, and I think what we're struggling with- Don't answer my Fifth Amendment question by referring to the Fourth Amendment. Please answer my Fifth Amendment question. We can talk about the Fourth Amendment separately. Okay. With regard to the Fifth Amendment that applies in the federal context, but similarly the Fourteenth Amendment that applies to pretrial detainees, the Bell v. Wolfish case, which again is another case from 30-plus years ago, that specifically found with regard to pretrial detainees, they're not allowed to be punished. And that the Eighth Amendment standard- If you want to address those cases, this is your opportunity. And Peratt, I think, talks about a liberty interest, if I'm correct in that. And my point is this was not a negligence case. The question in Peratt has to do with a prison hobby kit. It was property. But it doesn't matter. The Supreme Court has applied it to both liberty and property. The key is Daniels, and I wish you would address the holding of Daniels that negligent conduct does not violate the Due Process Clause. I absolutely agree that negligence conduct does not rise to constitutional violation. Counsel, the problem is addressed in Kingsley, and I thought it was solved there, where Justice Breyer's opinion for the court explains that there are, in essence, two states of mind to think about. One is whether the defendant was acting intentionally in changing the way the world is or choosing not to change the way the world is, such as do we apply force in that case? Or I would think your argument here is do we treat Ms. Gomes or do we take her to the hospital or just continue watching her? Those were intentional decisions, were they not? Absolutely. And then your argument is they were objectively unreasonable decisions. Is that right? That's correct. Yeah, they made a conscious decision to let her lie there, basically, would be the, as Judge Hamilton is saying, the map onto Kingsley. Absolutely. Now, that doesn't answer the larger questions about whether Kingsley should extend to health care claims, but we're all feeling our way with that one. Right. And with regard to Kingsley, and it was an excessive force case, and I think absolutely that's the issue here, is that we don't get, there was an intentional act here, too. So we're not going to carve out excessive force as a hierarchy of a constitutional violation. It's not as though somebody had lost the papers and forgot that she was in the jail or negligently. Or a slip of the scalpel. Not an accident. Absolutely. Absolutely, not an accident. So if somebody is speeding on the road and that leads to a collision, you would call that not an accident because the driver deliberately was exceeding the speed limit, and so it's an intentional tort rather than negligence. The negligence question I have always conceived is whether the person intended the outcome. There's no claim here that the defendants intended Gomez to die, right? Well, absolutely. They all knew that that's where she was headed. Unless you think that all speeding is an intentional tort rather than negligence when an accident occurs, I don't see how you have gotten away from Daniels. Well, the issue in terms of a car, this was like everybody knew where the conduct of not eating and drinking did lead to death. Well, I think what you need to do is map Kingsley onto Daniels because, of course, you could equally say that the officers in Kingsley didn't intentionally want to use too much force, excessive force. The way Justice Breyer breaks it down over the dissenting opinions, by the way, of some other members of the court, pulled out the intentionality of the act, i.e. speeding, versus the intentionality of the result, bashing into somebody and said, obviously in Kingsley, that the objective standard applied to the second. Maybe in the speeding example it's a negligence standard that applies to the outcome and you wouldn't have a constitutional problem there, but you would certainly have a state law tort. And in Kingsley, the court specifically said that a pretrial detainee can prevail by providing only objective evidence concerning the challenged governmental action. That language indicates that the Supreme Court did not intend to limit its holding to excessive force cases only. And prior to Kingsley, the issue of pretrial detention standard of care was set forth in an objective standard in Belfie-Wolfish. And following Kingsley, both the Ninth Circuit and the Second Circuit have expanded, well, we wouldn't argue that they expanded, but they followed Kingsley in applying the objective standard to both failure to protect claims and conditions of confinement claims. Counsel, to the extent you're arguing a due process claim here, which is what I understand the core constitutional claim, you still have to deal with the Peratt problem. Some of us call it Peratt, but about whether there is an adequate state remedy and whether that matters. Could you first address whether there is an adequate state remedy and then whether that matters? We don't believe there is an adequate state remedy. The medical negligence is a separate claim similar to the Fourth Amendment where you might have state battery claims, but you also have a constitutional Fourth Amendment claim. So the issue is that it does matter. This cannot be compared to a prisoner not getting a hobby kit like in Peratt, but this woman was a pretrial detainee held on a minor charge, and as Amika pointed out, she exemplified who's in pretrial detention, people who can't afford bail, people who are struggling with mental health issues, and this is why the failure to protect claim was also so important because Okay. You haven't really answered my question about Peratt, and I frankly don't understand what your failure to protect claim adds to your case at all. Well, what the failure to protect claim adds is highlighting the custodial duties and responsibilities. In this case, when the jury was sent an adequate medical care case, they were not told and it was not underscored that, in fact, defendants, jailers, have an obligation to those they take into custody. Is this a separate claim or just something that you thought should have been included in the jury instructions that it was not? We believe it was a separate claim. As the Ninth Circuit announced Is it a separate claim or separate theory for recovery of the damages that you are asserting she suffered? It is a difference, which is important. And I think that it was a separate theory of recovery. Okay. And an important one. What does it add? It adds a context to the treatment of Ms. Gomes by the defendants, that under jurisprudence and also of the jail suicide cases, they had a duty. And this was the issue in the case below on the trial. The defendant's mantra was she had a right to refuse. She had a right to refuse medical care. She had a right to refuse food. She had a right to refuse drink. Well, she did not in the context of being in custody and detained in the Lake County Jail. They had a duty to protect her and protect her from self-harm. That wasn't in the jury instructions? That was not in the jury instructions, I don't believe. And it was because the district court below claimed that, well, the family testified that she was a Catholic and that they didn't know of any other mental health problems she had in the past, but that didn't stop the Lake County Jail from putting her on suicide watch for 11 days, just observing her, seeing her obvious condition deteriorate, see that she continued not to eat or drink. And she was uncommunicative, too. And she was uncommunicative and nonresponsive. I think you are in your rebuttal time. This is our new system. I do see that. I just want to, just going back to causation for a moment, the plaintiff's experts, I think we've talked about them, but the defendants themselves with regard to causation knew that death could result. Dr. Elizaghi documented on December 22nd and December 27th that her liver and kidneys could fail and she could die. Dr. Singh also similarly recognized that this was life-threatening behavior. When Dr. Kim found her nonresponsive, severely dehydrated, and immediately sent her out, he, and I think we talked about Dr. Kim, too, in terms of causation. But all of this, and the only other thing I want to say about the coroner's report was that it wasn't a report of a single public official. It included the report of the autopsy and physical examination of the body signed by a Dr. Montes. There was a narrative of a coroner investigator that indicated a hearing had been held on the manner and cause of death. And the conclusion, the ultimate conclusion on cause and manner of death was signed not only by the coroner, Artis Yancy, but also the deputy coroner, Michael Donnerworth. So that was strong evidence of causation. And in taking all the evidence together, the jury should have been allowed to consider damages for the wrongful death. And I'll reserve my 144 that's left. That's fine. Thank you. Certainly. All right. We are ready to hear from the appellees. Who would like to be first? Mr. Howie? Good morning. Good morning. May it please the court, I am Scott Howie, and I represent the defendants' appellees in this matter who we're calling the medical defendants, Dr. Elazighi, Dr. Singh, and Correct Care Solutions. Judgment was correctly entered for all of the medical defendants, both on the Rule 50 judgment on the wrongful death claims and on the judgment following the jury verdict against one of the other medical defendants. And in both respects, those judgments should be affirmed. First, with respect to the wrongful death claims. I have some difficulty, counsel, with the idea that the evidence didn't even create a jury issue on causation of death. In part, that's because I find it hard to reconcile with the jury's actual verdict, and in part because if indeed Gomez was in organ failure by the time she arrived at the hospital, it does make some sense to attribute the death to the decisions made at the jail. So why is this no jury issue at all? It's important to recognize, Your Honor, the status of the evidence concerning multiple organ failure, and that requires the court to recognize that in a sense there are two appeals here, two very different aspects of the plaintiff's appeal as to the medical defendants versus the correctional defendants. There are different sets of defendants. There's only one appeal. And in any event, I'm asking about causation, not about the number of appeals. And the importance of that distinction, Your Honor, is that the evidence that the plaintiff's counsel refers to about multiple organ failure is evidence that was in the summary judgment record. It's not evidence that was presented at trial, and that is the importance. But that was because of the court's somewhat difficult-to-understand ruling about the wrongful death claim. The court was perfectly aware that that evidence existed, the evidence of the organ failure, and had the plaintiffs been permitted to go forward to the jury on the wrongful death claim, the jury would have heard it. The wrongful death claim was entered at a point in trial after the plaintiff's case had been closed, I believe, and therefore the record of the evidence presented at trial does not include the evidence that the plaintiff points to in the summary judgment record. We still have the coroner's report. We have Dr. Reba saying that Dr. Elazogie's failure to act caused or contributed to her death. Why isn't that enough to get to a jury? Well, Dr. Reba's opinion as to cause of death was entirely dependent on the coroner's report. So in a sense, we're really only talking about that report. He deferred to the coroner's report when asked what the cause of death was. He simply turned to the coroner's report and said, as it says, complications. He was familiar with the whole record, and the whole record seems to point to death as resulting from the starvation and dehydration as a form of slow-motion suicide. And doesn't Dr. Reba testify that as of December 25, she's already starting to show signs of organ failure, needed to be someplace where she could be treated? He said she needed to be someplace where she could be monitored, and he doesn't speak at all to what the treatment for her case would have been. What is it about organ failure that's okay? Organ failure is certainly a bad thing, Your Honor. We wouldn't contend differently. But the question of causation depends upon the question of what could have been done to treat her condition, whatever it was. So we know she's not eating. We know she's not drinking. We know she's becoming badly dehydrated. These tent things are getting more and more alarming. We have expert testimony that the inaction, that the failure to do anything, is contributing to her ultimate demise and death, and we have the coroner's report that says she died of starvation and suicide. The coroner's report says that she died of complications. Which is organ failure, and we have the evidence of that. But that evidence is not contained in the record of what the evidence was presented to the jury. So what more do you need? I understand you might want to get into more detail if you wanted to, but why does the plaintiff have to do more and overly complicate what seems like a fairly straightforward, if horrifying, path here? Because the case law addressing both the state law medical malpractice claims and the federal constitutional claims requires a causal link, and it requires, particularly as evidenced by the state law concerning causation, it requires something considerably more than an expert dutifully reciting the opinion that a defendant's conduct was the cause or contributed to the death. What more is needed? Rule 705 allows expert opinions to be stated in fairly conclusory form and allows, in essence, the backup and the probing to come into cross-examination. Why isn't the combination of the coroner's report and Dr. Raba's opinion sufficient to get to the jury and let you take shots at it with contrary evidence and cross-examination? Yeah, you could say somebody came into a room and shot her, and that's what killed her, not the starvation. Well, for two reasons. One is that there is no evidence in the record of what was presented to the jury of anything that happened in the hospital. Those six days, as far as the jury... Did you want to put it in? Did you try to put it in? There was no need for the defense to put it in. No, there was no need for the defense to put it in because the coroner thinks that what happened before she got to the hospital killed her. Nobody was starving or dehydrating her at the hospital, we assume. Presumably they set up an IV right away. And the more important issue, though, is whether that IV or whether any intervention would have made a difference in her condition. And the coroner says no. The coroner says she dies of the starvation, which had already happened by the time she gets to the hospital. But the question, though, is what would have happened at the hospital? All that the plaintiff's experts spoke to... Why is that relevant? I mean, the coroner rules out hospital-based events by saying that she dies of the starvation and suicide, the self-induced starvation. So the coroner, having ruled out any hospital-based things, it seems to me you would be the one to say actually there was a raging MERS infection going through the hospital or the nurses decided to omit her room or whatever hospital-based thing. But the coroner rules it out. But what the coroner doesn't speak to and wouldn't be expected to speak to is what sorts of medical intervention would have been possible to give. Is it your theory that she got poor care at the hospital? There isn't any theory based on what happened in the hospital, Your Honor, because there's no evidence of what happened in the hospital. The coroner thinks it's irrelevant. That's what the coroner has told us. But all that the coroner says is that it's complications of dehydration and starvation. Right. What those complications are. They had already happened by the time she gets to the hospital. And Dr. Reba says that Dr. Elazegui's inactions contributed to Gomez's ultimate demise and death. In fact, Your Honor, there is no testimony regarding the... He does testify that way. That's what he says. Well, it's not testimony, first of all. It's only the coroner's report. And the report speaks only of complications that aren't identified in the report. And there's no witness who testified to explain the coroner's report. So there is, respectfully, no way of knowing what those complications were, whether they occurred before or after she was in the hospital. And that's the burden of the plaintiff. Is it your position that in Illinois, the medical staff is permitted to allow a prisoner to commit suicide on their watch? Now, in some states, suicide is a voluntary choice. And you can opt for it. And one could say that that's what Gomez was doing. She was committing suicide slowly. Is that the case in Illinois? In candor, Your Honor, I don't know if that's the case in Illinois. The fact is, though... Was it an argument at any time in this case that if Gomez wanted to commit suicide, then the defendants had no duty to stop her? I don't believe so, Your Honor. It certainly is known that because she was in the process of committing suicide, and the coroner's report does state that as the manner of death, that that, if anything, is the causation involved. And that because there is no evidence regarding what happens in those six days in the hospital, it would have been impossible for the jury to render a verdict saying that included as an element that the causation was something that was to be blamed on the defendants. I don't think that's right. I mean, the coroner's report links together the suicide with the starvation. Nobody says, you know, she took a bottle of Tylenol or in any other way committed suicide. It was starvation suicide. And, of course, we do have evidence in the record even if competent people can decide to commit suicide, that Dr. Singh didn't think she was one of those people. And, again, Your Honor, the question, though, is what could have been done for her in the meantime? Why is that the question? We have plenty of law to suggest that if the doctors take steps that significantly increase your risk of injury or death, that's enough. The doctor doesn't have to, you know, unplug the machine, so to speak. It's not an all or nothing situation. So I don't see why, you know, your theory basically is if there's some evidence that the hospital could have turned all of this around, which, of course, implies that the hospital was negligent by not doing that, but if there was some evidence of that, then your clients get off the hook for the wrongful death. Well, and likewise, if there is... That seems to be a very problematic position to take when you think of this risk enhancement theory. But I think the question can perhaps be answered by looking at one of the plaintiff's own cases. And the Bass v. Wallenstein decision this court issued in 1985 refers to, and that's a case the plaintiff cites as an example of evidence that's sufficient. That case sets forth very specific evidence of what could have been done in a case identical to the one that was at issue before that court. Right. But, of course, in a case where you're already an organ failure, maybe there is no such evidence. Could I come from a different direction? Go ahead. There was no evidence that the organ failure itself was fatal at that time. There was no evidence as to whether something could have been done. I understand your position on that, counsel. I have real trouble with it. But let me ask you about a related factual point. If I understand this correctly, part of the defense was, in essence, well, we can't intervene too quickly here because she may have First Amendment rights at issue. That was argued in the trial court. And that sometimes fasting can be a form of political protest and so on, although I gather there's no real indication she was communicating such a purpose. But wasn't there also evidence that some of your clients, the medical staff, said they needed to consult the legal department? That is correct. Is there any evidence about whether they did so in fact and whether they got any response? I believe the evidence, there is no evidence that they did, if that answers your Honor's question. Shouldn't we be troubled by that then, that they thought, well, we've got to make this decision here, we think we need legal counsel, and then they never bothered to get it? I think that would have gone to the question of simply of, that again doesn't go to the causation question. No, it doesn't. It's not the only issue in the case. No, that might have gone to the question of deliberate indifference. Certainly it may have played a role in the jury's understanding of the claims that did go to it and recall that the jury did have that evidence and while it was unable to render a verdict as to the doctors, it did return a verdict against Jennifer Bibiano, a verdict that has in fact been paid, and that in turn renders all of the issues that were at issue at trial, any of the trial errors that the plaintiff complains of, harmless error. Well, not really because if the wrongful death should have gone to the jury, the verdict against Bibiano was based on the cutoff point that the district court proposed, and so there could well be additional liability. And if there were to be an issue at trial, if there were to be a new trial on this issue, certainly we maintain there should not be, but were there to be a new trial, that would be an issue for the district court to determine anew based upon the evidence placed before it. It's not an issue before this court, certainly not as to the medical defense. Certainly the measure of damages, if it's just pain and suffering for a few weeks in the hospital, that's one thing. If it's loss of life, the measure of damages is typically much larger. And would have required additional evidence, again, regarding that connection. Right. I mean, of course, if that stage of the trial had ever happened, I'm sure there would have been additional evidence. Since it didn't, there wasn't. But that was the claim at issue before the court. When the jury was presented with evidence, wrongful death was still an issue, and yet that evidence of a connection to the death was not presented. The district court determined that there was evidence as to pain and suffering. I see that I've consumed both my time and the time that Mr. Gibbons was intending to use. No, we set this for 15 minutes. I'm sorry. I'm misinterpreting the new system. We're preserving Mr. Gibbons' opportunity. I'm glad to see that, Your Honor. I'd be happy to answer any additional questions the court might have, but in the event that there are none, I would simply ask the court to affirm the judgments as to the medical defendants. Okay, thank you. Thank you. So now, Mr. Gibbons, you indeed have your 15 minutes. My proverbial 15 minutes of fame. I was thinking that. May it please the court. Good morning. Jeff Gibbons on behalf of the county defendants. There is a lot to talk about, and I only have 15 minutes. And it's hard not to want to address Kingsley in particular with Judge Hamilton in front of me, who's in some ways the progenitor of Kingsley with your dissent in the Seventh Circuit. It was by name vindicated by the Supreme Court. I've also been reversed by name. You also applied Kingsley this year in the Mulvaney case. These are all opinions of the court, of course. Correct. And cited in the briefs. And, in fact, I think interestingly, you decided in the Estate of Clark case not to apply Kingsley to a medical care claim. It's an interesting reading of Clark, but go ahead. I think it's a fair reading. Kingsley was not applied in Estate of Clark to a medical care claim in the sense that Estate of Clark did not apply the objective reasonableness standard that was adopted by the Supreme Court. So I want to talk about Kingsley. There's also the Vienna Convention claim. There's also the Monell claim. But I think first there were a couple of factual questions that you raised, and if I could just add to the record, I do want to point out that there is, Judge Hamilton, evidence in the record that CCS did call their legal counsel. And I know that because, in fact, Scott Fitch, one of my clients, when he was consulting and checking in with CCS to make sure they were following their policy, part of their policy is to call legal counsel, and he asked Mr. Keegan, a non-defendant, by the way, if, in fact, legal counsel had been called, and he was told yes. I take it it's in the record? I believe it's in Mr. Fitch's deposition. I believe it's in Mr. Keegan's deposition. And so, yes, it is in the record. Mr. Given? Yes, sir. Neither of the two briefs filed by the defendants so much as cites Daniels or Peratt. What do you think the consequence of that is? It had not occurred to me to address the Fifth Amendment, but I don't think it's of consequence. It's pretty important. Now, of course, sometimes we can relieve parties of forfeitures, though we can't relieve them of waivers. But to not cite Daniels, which establishes the state-of-mind requirement for Fifth Amendment due process claims, certainly is a forfeiture. Any reason why we should reach these issues unargued by the defense? I would argue yes, because the Daniel issue of the fact that negligence is not enough is also addressed in the cases that we do talk about in the briefs. Estelle moving forward, including Kingsley, which discusses the fact that negligence is not enough. So whether it's a Fifth Amendment due process claim or a 14th Amendment due process claim, I would argue that the conduct of the defense of the Daniels would be essentially analogous. The issues raised with regard to the state-of-mind. I'm not sure that the plaintiffs ever argued that negligence was enough, what they were arguing, jumping right to perhaps the second part of Kingsley, was that an objective test should be applied to the reasonableness of the conduct. The conduct itself having been undertaken somehow, intentionally, negligently, recklessly, viciously, whatever it is, but their argument has focused on whether once you've got the conduct established, an objective test applies or whether you go back to the farmer against Brennan sort of standard, which is borrowed from the eighth amendment. Everybody agrees that applies to people in prisons who've been convicted for whom the presumption of innocence is no longer there. So I'm not sure jumping right to negligence helps you too much. Well, there's a lot to address in your comments, Your Honor. First thing I would say is that in fact, plaintiff did not raise objective reasonableness at all in the lower court with regard, except in the context of they said the fourth amendment should apply because Ms. Gomes had never had a Gerstein hearing. So they in fact agreed below that if the 14th amendment applied, that deliberate indifference was the proper standard. But they argued that the 14th amendment didn't apply. And in fact, because Ms. Gomes was- I get, I must say, I get completely confused by saying the 14th amendment didn't apply. The fourth or fifth or eighth amendments are applying through the 14th. The 14th amendment is the thing that applies. And then we talk about the legal standards of those other amendments. So the plaintiffs were surely not saying the 14th amendment doesn't apply. In that sense, of course, Your Honor. But since the Lopez case and the Williams versus Rodriguez case, this circuit has set up a tripartite way of analyzing these cases. Which got blown out of the water in Manuel against the city of Joliet. Yes. So we are not actually applying that tripartite test anymore. As we are dutiful stewards- This circuit has not fared very well in the Supreme Court in the last couple of years on claims by people taken into custody. We are back at ground zero here. So what I wanted- So first of all, with regard to the question- No, no, that's fine. With regard to the question about legal counsel, I do think the record includes evidence of that. Also, I just want to clear up very quickly a factual misstatement or misunderstanding. Ms. Gomes was not in jail for the failure to appear for jury duty. That's the resisting. No, I understand. When she's arrested for the unfortunate and mistaken jury duty problem, she pushes somebody and she gets charged with resisting. And then she doesn't show up when she's supposed to. And then that's what pops her into the jail. She is still a pretrial detainee, however, no matter what. There has never been an adjudication of her guilt of this misdemeanor of resisting. Correct. And she's dead. But under the law, as it certainly existed at the time, she was a post-Gerstein pretrial detainee as opposed to a pretrial- I'm sorry, a pre-Gerstein pretrial detainee. Right. But we just need, for our purposes, the critical fact is that she's a pretrial detainee. And there's been some very significant thought in other circuits and signals from the Supreme Court, in any event, from Kingsley, one might think pretty strong signals, that pretrial detainees are subject to a different legal standard than people who have been convicted. Yeah, certainly. On the other hand, the Supreme Court has mentioned in the county of Sacramento v. Lewis, which, by the way, was not a medical care case, but the Supreme Court went out of its way to mention medical care claims in the context of deliberate indifference. In the city of Revere, which- Which predates, I'm going to remind you, you probably know this, Kingsley. Correct. The Supreme Court didn't have before it that issue in the Lewis case, and you know- And yet they reached out to talk about medical care claims in Lewis, just as they could have in Kingsley, but did not. That's why we argue that- That's why you need to look at the rationale and the real problem that the court is grappling with and ask if that rationale was intended in Kingsley to be limited for some reason that one could deduce from the discussion to the excessive force context, or whether that rationale applies to other contexts. The court itself suggests a few others, but it's not doing a comprehensive treatise. That's not the way they work. And that's correct, of course, but I do think it's important to point out that even in the context of the Eighth Amendment discussions about medical care claims by the Supreme Court and the Seventh Circuit, and in the cases which apply the Eighth Amendment standard to Fourteenth Amendment due process, I'll just call it the due process claims. That's fine. They do talk about a rationale for why a scienter element is important for a medical care claim. Yes and no. We have tried, and I will be the first to admit not always successfully, but we have frequently said something along the lines of pretrial detainees are certainly entitled to at least as good as the prisoners do. And so if you apply the Eighth Amendment standard and you discover that that's been violated, well, in some sense, the greater includes the lesser. They might be entitled to more, we have frequently said. Frequently. Which I think is consistent. In fact, this circuit has said that. Consistent with bell against wolfish. Indeed, compelled by bell against wolfish. In fact, this circuit and other circuits have, in fact, noted that exact same language you just pointed out, and in each and every instance that I have found, have punted. Ultimately, they say we don't need to decide it here. Well, it will be hard to punt in this case. Well, except with regard to my clients, Your Honor, it isn't, because as the discussion started earlier, you don't need to reach the issue in this case with regard to the correctional officers, both because of the waiver issue of what was argued below and the issues of judicial restraint having to do with the single recovery rule, having to do with qualified immunity. And while I don't have a lot of time to get into the details, if you look at the record, if you read the briefs, you will see that even under an objective reasonableness standard, and the objective reasonableness standard is articulated in, first in Kingsley, also in Mulvaney, also in Castro and Darnell. If you look at the standards that are laid out, you will find that the correctional officer, that the correctional defendants in this case, who, by the way, are not the correctional officers who were with Ms. Gomes for 15 days. It's the sheriff who had no personal involvement with her. In fact, there's no individual liability claim against him. Hunter actually personally goes and visits her. I mean, he is taking Hunter, one of the correctional defendants. Correct, which is why he was neither deliberately indifferent nor was he unreasonably relying on the medical staff.  The nurse said she was medically stable, that she was being monitored every four hours, and that if anything changed, she would be sent to the hospital. And so I believe Chief Hunter would meet the elements of the objective reasonable test as laid out in Kingsley and its progeny. Same with Scott Fitch. So for those reasons, and just like in Collins, which Judge Easterbrook, you were on the panel in Collins. It doesn't make any difference who was on the panel and who wrote the opinion. You've been reminded of that once already. I'm sorry, Your Honor. Ad hominem arguments should be avoided. As in Collins, the result in this case would not change, regardless of which standard is applied. And under the judicial restraint doctrine, that's why I said, I don't think you need to address the Kingsley issue in this case if you didn't want to. I do think, going back with regard to if this court, in fact, wants to address Kingsley and whether it should apply to medical care, I would add, yes, sir. I'm sorry. We may or may not have to decide it with respect to your clients. It's hard to avoid it with respect to the medical defenders. And I would add that, and this is where I started a little earlier and I got sidetracked by myself, the Eighth Amendment cases and the other cases which talk about Estelle and the rationale behind that do talk about the need in evaluating medical care claims and having a scienter or a mens rea element. And that's, at bottom line, the line that's been used by the Supreme Court and other courts is they don't want to constitutionalize medical malpractice. And by removing the scienter, that could well happen, which has a real problem with regard to correctional staff who, if there was no scienter element, we would be creating a system where jail staff, who has no medical training at all, would be in fear, out of a protective self-interest, would constantly be in the position of second-guessing medical staff and saying, oh, I know they say they're doing okay and she looks all right to me, but just to be safe, I should send her to the hospital. And that's not a good thing, and there's no evidence. Well, why wouldn't it? I mean, I assume you're not giving up the idea that it's, in the great run of cases, objectively reasonable for the correctional staff to rely on the medical staff's judgments. That's correct. That rule's been stated many times. Sure. And in those cases. So I don't know why there's this giant chilling effect if that rule's in place. I see your point, Your Honor. I have 28 seconds left, and rather than start something new, if there are any other questions, otherwise I would ask that this court affirm the judgment of the district court in granting summary judgment to the county defendants on all claims. Thank you very much. Thank you. Anything further, Ms. Hoft? Just briefly, Your Honor. With regard to the liability of the corrections defendants, I won't belabor those points. We will stand on the issues raised in our briefs. I would just say with regard to Chief Hunter, who did actually personally observe Ms. Gomes confined to the bed in her cell, lifeless and nonresponsive, and did not act. And with regard to the issue of bringing up negligence versus constitutional violation, and thankfully I think the case law says it's not fatal if you don't pick the right constitutional amendment to argue that legal theories need not be argued. I would just point out that this is a . . . That I don't get. Legal theories need not be pleaded, but by the time you're in the district court and at trial, you have to identify your legal theory. That's correct. I was referring to Mr. Givens' argument where he said we argued the Fourth Amendment in response to summary judgment and cited Kingsley, but as you say, that is of no matter now. But in Curry v. Chhabra, the specific issue of the defendant and the court held that the defendants counter that we should recognize a special carve-out for doctors and nurses because of the Fourth Amendment's objectively reasonable standard resembles the standard for the common law tort of negligence. And this argument was rejected in that context. And we would argue that it should be rejected in this context, too. We seek a remand of this case for a jury to determine wrongful death damages in this case for consideration of plaintiff's failure to protect theory and the claims against the corrections defendants and that the jury consider these claims under an objectively unreasonable standard pursuant to the Supreme Court and Kingsley. Thank you. Thank you very much. Thanks to all counsel. We will take the case under advisement.